# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**LORI ARNOTT,**

**Plaintiff,**

**v.**          **Case No. 2:22-cv-4552**
        **JUDGE EDMUND A. SARGUS, JR.**

**HOLZER HEALTH SYSTEMS,** *et al.*,       **Magistrate Judge Kimberly A. Jolson**

**Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants Holzer Health Systems and Holzer Clinic, LLC's Motion for Summary Judgment. (Mot., ECF No. 26.) Plaintiff Lori Arnott opposes that Motion (Opp., ECF No. 35), and Defendants replied in support of their Motion (ECF No. 39). For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion.

## BACKGROUND

This case arises from Defendants' decision to terminate Ms. Arnott from her position as a nurse practitioner at the Holzer Clinic after she exhausted her leave under the Family Medical Leave Act ("FMLA") and requested additional medical leave.

Ms. Arnott was employed by the Clinic's Family Medicine and Primary Care Department at its Athens, Ohio location from April 2012 until May 2022. (Arnott Dep., ECF No. 26-2, 33:04–11; 34:15–16; 44:20–22.) The Clinic is a subsidiary of Defendant Holzer Health Systems that provides outpatient services. (Chadwell Dep., ECF No. 26-4, 4:20–5:07.)[1] Ms. Arnott was the first nurse practitioner hired into the Department and brought with her a patient base. (Arnott Dep., 36:16–21; 40:16–21.)

---

[1] The Parties each filed excerpts of the deposition transcript of Tyler Chadwell, which are referred to collectively by the Court as "Chadwell Dep." throughout. (*See* ECF Nos. 26-4; ECF No. 35-4.)

Her job duties included seeing new and existing patients, providing follow up, preventative, and acute care, as well as returning phone calls, reviewing lab results, responding to messages, and refilling prescriptions. (*Id.* 40:2–15; 43:3–19.) Her supervisors during the relevant period were Tyler Chadwell (Practice Manager and Director of Operations) and Lance Broy (Medical Director). (Chadwell Dep., 08:02–11; *see also* Broy Dep., ECF No. 26-22, 10:13–22.)[2]

## I. Ms. Arnott's History of Chronic Migraines

Since she was a teenager, Ms. Arnott has suffered from chronic migraine headaches. (Arnott Dep., 68:01–08.) When she experiences a migraine headache, she also experiences dizziness, auras, nausea, occasional vomiting, sensitivity to light, and blurred vision. (*Id.* 69:13–70:24; 71:03–21; 128:5–16.) Her migraines typically occur two to three times per week and last from six hours to two days. (*Id.* 74:17–20; 75:10–14.) The most common triggers of Ms. Arnott's migraines are scents like perfumes, barometric pressure changes, stress, and red wine. (*Id.* 69:02–12.) While Ms. Arnott has been able to identify triggers, she has not determined the cause of her migraines. (*Id.* 179:03–04.)

Starting in 2016, Ms. Arnott began using intermittent leave under the FMLA to take time off when her migraines kept her from working. (*See* ECF No. 26-17; Arnott Dep., 85:10–13; 86:01–13; 127:15–19.) Bethany Purkey, Holzer Health Systems' Vice President of Human Relations, explained that Ms. Arnott applied for and received intermittent FMLA leave routinely starting in 2016 and continuing through 2021. (Purkey Decl., ECF No. 26-18, ¶ 3.)[3] Although Defendants never prevented Ms. Arnott from taking FMLA leave, she testified that she felt her

---

[2] The Parties each filed excerpts of the deposition transcript of Dr. Broy, which are referred to collectively by the Court as "Broy Dep." throughout. (*See* ECF Nos. 26-22; ECF No. 35-3.)

[3] Attached to Ms. Purkey's Declarations are Ms. Arnott's requests for intermittent FMLA leave spanning from 2016 to 2020, as maintained by Holzer's third party administrator Sun Life. (*See* Purkey Decl., PageID 573–81.)

request for leave were not well received. (Arnott Dep., 87:15–88:12; 88:22–89:08.) She explained that she experienced "subtle retaliation" from Dr. Broy and Mr. Chadwell who suggested that she was "playing hooky from work when [she] was having migraines." (*Id.*) Ms. Arnott also testified that Mr. Chadwell and Dr. Broy made comments indicating that she needed to get her migraines under control. (*Id.* 89:23–90:21.)

## II. Ms. Arnott's Migraines Became More Severe in 2021

In 2021, Ms. Arnott began experiencing "migraines more days than not" and the migraines impacted her ability to work by making it difficult to concentrate and find words. (Arnott Dep., 76:19–24; 77:1–6; 135:19–24.) When Ms. Arnott experienced migraines, she would call off work for the morning and the Clinic would reschedule her patients to available appointments in the afternoon. (*Id.* 132:2–134:04; 137:6–10.) But often Ms. Arnott would later need to call off the entire day which required the Clinic to cancel and reschedule her patients a second time. Ms. Arnott acknowledged that this practice "inconvenienc[ed] the patients." (*Id.* 132:17–23.)

Ms. Arnott testified that she was using the majority of her Paid Time Off (PTO) to cover absences resulting from her migraines. (*Id.* 140:06–16.) She contacted the Human Resources Department to ask if she could reduce her hours per week. (*Id.* 138:2–9; 140:21–23.) Ms. Arnott explained to Brandi Johnson in the Human Resources Department that she was "having significant problems with chronic migraines and missing work." (*Id.* 138:10–13; *see also* ECF No. 26-21; PageID 604.) Ultimately, Ms. Arnott decided against a reduced schedule because she was concerned that Dr. Broy would use it to get her out the door. (Arnott Dep., 147:19–24.)

In November 2021, Dr. Broy, Mr. Chadwell and Ms. Purkey met with Ms. Arnott to discuss "possible accommodations to better serve [Ms. Arnott], our patients, our staff, and the other

3

providers in the department." (Chadwell Dep., 29:12–24; 30:1–9, 31:1–3; *see also* Purkey Dep.,[4] ECF No. 26-24, 21:02–07; Broy Dep., 19:01–15.) Mr. Chadwell described this meeting as a "brainstorming session" and Dr. Broy similarly stated that they were "trying to troubleshoot and find resolutions." (Chadwell Dep., 29:10–11; Broy Dep., 20:21–23.) Dr. Broy explained that Ms. Arnott's more frequent absences were "becoming a strain on the practice and the other providers." (Broy Dep., 20:03–12.)

Defendants suggested reducing Ms. Arnott's schedule, but Ms. Arnott proposed a modified scheduled instead. (ECF No. 26-25, PageID 636.) At the time, Ms. Arnott worked four, 10-hour days, Monday through Thursday with Thursday being the day she saw patients virtually. (Arnott Dep., 116:20–22; 123:24; 124:1–9.) Ms. Arnott proposed that she see patients virtually on Mondays, instead of Thursdays. (ECF No. 26-25, PageID 636.) She explained that Mondays were often the days when her migraines were the worst and she believed that she could treat them and work from home. (*Id.*; *see also* Arnott Dep., 146:18–24; 147:1–6; 149:1–10.) Defendants countered that Ms. Arnott's schedule could be changed so that she worked Tuesday through Friday, with Friday as the day she saw patients virtually and Monday as her day off since it was the day she most often experienced migraines. (Arnott Dep., 150:18–23; Chadwell Dep., 36:3–8; *see also* ECF No. 26-26; PageID 638.) Ms. Arnott agreed to the schedule change proposed by Defendants. (Arnott Dep., 151:03–18; *see also* ECF No. 26-25, PageID 635.)

### III.     Ms. Arnott Exhausted FMLA Leave and Requested Additional Medical Leave

But in the beginning of 2022, Ms. Arnott experienced a "dramatic worsening" of her migraines. (Arnott Dep., 72:04–6; 74:02–4; 80:9–11.) Her migraines were lasting longer— sometimes for multiple days. (*Id.* 75:22–24; 76:1–2.) And her symptoms intensified such that she

---

[4] The Parties each filed excerpts of the deposition transcript of Ms. Purkey, which are referred to collectively by the Court as "Purkey Dep." throughout. (*See* ECF Nos. 26-24; ECF No. 35-5.)

could not drive safely or "put a meal together timely." (*Id.* 72:08–13.) She would "go to say one word, and another word would come out." (*Id.*) Her problem-solving, word-finding, and decision-making skills were all greatly impaired. (*Id.*)

On March 18, 2022 she informed Mr. Chadwell that she could not work for the next six months. (Arnott Dep., 172:17–21; ECF No. 26-28, PageID 653.) A few weeks later, the Clinic received documentation from Ms. Arnott's treating physician Dr. Lionberger that Ms. Arnott could not work due to chronic migraines and a new diagnosis of "clouded consciousness." (ECF No. 26-29, PageID 657.)

To cover her absences, Ms. Arnott first requested and was granted continuous (not intermittent) FMLA leave beginning on March 8, 2022. (ECF No. 26-30, PageID 674–75.) She exhausted her continuous FMLA leave on April 14, 2022. (ECF No. 26-30, PageID 674–75.) Ms. Arnott also applied for and was granted short-term disability benefits effective March 9, 2022 through June 7, 2022. (ECF No. 26-31, PageID 690.)

After exhausting her FMLA leave, Ms. Arnott requested an accommodation in the form of a leave of absence continuing through September 8, 2022. (Arnott Dep., 179:15–22; 210:23–211:02.) In support of this request, Dr. Lionberger states that Ms. Arnott would need "as long as 6 months off" but explained that her condition could improve and allow her to return to work earlier. (ECF No. 26-32, PageID 696.) Dr. Lionberger said that there were no workplace restrictions or accommodations that would allow Ms. Arnott to continue working but mentioned that she was scheduled to see a specialist in May 2022. (*Id.*) Although she referred Ms. Arnott to a specialist, Dr. Lionberger could only say that it was "possible" that Ms. Arnott would return to work on September 8, 2022 and explained she "hoped for improvements that would allow return sooner than estimated." (*Id.* PageID 695.)

It is Ms. Arnott's testimony that she was prescribed Ajovy in May 2022, which resulted in a significant reduction of the symptoms that led her to request extended leave. (Arnott Dep., 81:13–16; Arnott Decl., ECF No. 35-1, ¶ 3.) She claims that by the middle of May she felt well enough to "consider[] contacting Dr. Lionberger about returning to work." (Arnott Decl., ¶ 3.)

### IV.     Ms. Arnott's Termination of Employment

In May, the Clinic decided that it could not accommodate Ms. Arnott's request for six months of additional medical leave. (Chadwell Dep., 44:04–10; Broy Dep., 37:01–21.) Ms. Arnott had her own unique patient base and because the other providers at the Clinic had their own patients to care for, the Clinic said it could not reassign all of Ms. Arnott's patients while holding open her position. (Chadwell Dep., 44:04–06; 45:11–12; Broy Dep., 27:14–24; 37:06–19.) The volume of patients, coupled with the fact that her return in September was only a possibility, led the Clinic to conclude it could not accommodate her leave of absence. (Mot., PageID 168.)

On May 23, 2022, the Clinic sent a letter to Ms. Arnott notifying her that it was terminating her employment under Section 2 of her employment agreement, which permits termination upon 90 days' written notice. (90-Day Notice, ECF No. 26-34, PageID 707.) The Clinic offered Ms. Arnott a severance package including her full salary pay and benefits continuing for 90 days. (*Id.*) Ms. Arnott rejected the severance package but continued to receive long-term disability benefits through the first week of October 2022. (90-Day Notice, PageID 709; Arnott Dep., 187:08–23; 212:15–17.) Ms. Arnott said she rejected the severance package because it required her to release her legal claims against Defendants. (*See* 90-Day Notice, PageID 710.)

### V.     Ms. Arnott's COBRA Notice

On July 18, 2022, Holzer sent Ms. Arnott a letter informing her that her insurance had ended and that Peoples Insurance Agency, Holzer's third party vendor, would send her a COBRA

notification form. (Purkey Decl., ECF No. 26-18, PageID 583.) Ms. Arnott testified that she received this letter. (Arnott Dep., 104:2–3; 105:09–17.) But she did not receive the COBRA notice sent by Peoples on July 20, 2022. (ECF No. 26-35; Arnott Dep., 100:17–101:13.) Defendants later discovered that the notice was sent to the incorrect address. (*Id.*) Defendants contend that the notice was never returned as undeliverable, so Holzer was unaware that Ms. Arnott did not receive it. (Purkey Dep., 40:3–05.)

In October 2022, Ms. Arnott's counsel contacted Defendants to request documentation of the COBRA notice. (ECF No. 35-2.) Six months later in April 2023, Defendants sent Ms. Arnott a new COBRA notice that Ms. Arnott received. (ECF No. 26-36; *see also* Arnott Dep., 104:09–11; 108:08–17.) She did not elect coverage because she had obtained Medicaid insurance through the marketplace. (*Id.*) Her Medicaid coverage had no premiums, but Ms. Arnott alleges that she incurred out of pocket expenses. (Arnott Dep., 104:22–24; 105:03–05.)

## VI.    Ms. Arnott's Employment Agreement

Ms. Arnott also claims that Defendants breached her employment agreement by failing to pay her for 90 days of pay and benefits and by incorrectly calculating her bonus. (Am. Compl., ¶¶ 27–34.) When she was hired, Ms. Arnott received a base salary plus the potential of a "productivity bonus." (ECF No. 26-3, PageID 452.) Once Ms. Arnott billed over $180,000 in services, she would receive a 3.5% bonus on that amount. (*Id.*)

Jennifer Neal, Holzer's Vice President of Provider Relations, testified that in 2013 the Clinic changed the bonus for advanced practice providers ("APPs") like Ms. Arnott. The bonus percentage and threshold dollar amount were lowered to 3% of billed services over $100,000. (Neal Dep., ECF No. 26-5, 17:4–23.)[5] But the employment agreement she signed in 2013 did not

---

[5] The Parties each filed excerpts of the deposition transcript of Ms. Neal, which are referred to collectively by the Court as "Neal Dep." throughout. (*See* ECF Nos. 26-5; ECF No. 35-6.)

expressly include a threshold amount to trigger the bonus. Instead, she was paid a "guaranteed annual salary" plus a bonus of "3% of [her] gross bookings." (ECF No. 26-8, PageID 499.) She signed similar two-year employment agreements in 2015, 2017, 2019, and 2021. (*See* ECF Nos. 26-10, 26-12, 26-13; 26-14.) Although her salary increased annually, the provision regarding the bonus on production remained the same. (*Id.*) The agreements all also stated that "[a]ll compensation shall be payable in accordance with the Clinic's normal compensation policies for the payment of APPs" and that "[a]ll compensation policies may from time to time, be modified by the Clinic in its sole discretion." (*Id.*)

Despite no threshold amount in her agreement, the notes in Ms. Arnott's employee file show that Defendants' practice was to give Ms. Arnott a bonus of 3% on services billed over $100,000. A note in Ms. Arnott's personnel file from January 2013 from Ms. Neal states that Ms. Arnott's production incentive bonus dropped to 3% over $100,000 in January 2013. (ECF No. 26-6, PageID 494; *see also* Neal Dep., 17:4–23.) Another note from 2016 states that Ms. Arnott should receive "3% incentive after the first $100,000 she produces." (ECF No. 26-15, PageID 559.)

But in April 2022, Ms. Neal sent an email asking her colleagues to "stop the practice we've been applying to Lori Arnott. She should receive her full production bonus for this first quarter of 2022 and each one thereafter." (ECF No. 26-16, PageID 561.) During her deposition, Ms. Neal tried to explain the change by testifying that Defendants changed the bonus structure from a threshold amount based on a percentage of production (i.e., gross bookings) to a threshold based on work relative value units. (Neal Dep., 30:11–21.) According to Ms. Neal, switching Ms. Arnott to the bonus structure "increased Ms. Arnott's salary and production bonus." (*Id.* 38:04–10.) When Ms. Neal suggested by email that Defendants make retroactive bonus payments, Lance Broy, the

Medical Director for the Clinic, emailed back and said he did not "feel that any backpay is warranted/needed." (ECF No. 26-16, PageID 562.)

## VII.   Procedural Background

Ms. Arnott subsequently sued Defendants after filing a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") and receiving a Right to Sue letter. (Compl., ECF No. 1; *see also* Am. Compl., ECF No. 16, ¶ 17.) Her Complaint against the Clinic and Holzer alleges six causes of action against both Defendants. (*Id.*)

Under Count 1, she alleges three violations of the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq.* ("ADA") and similar state laws: (1) Defendants failed to provide her with a reasonable accommodation, (2) failed to engage in the interactive process, and (3) wrongfully terminated her because of her disability. (Am. Compl., ¶¶ 18–20.) Counts 2 and 3 allege that Defendants terminated her in retaliation for requesting an accommodation under the ADA and for taking leave under the FMLA. (*Id.* ¶¶ 21–26.) Under Count 4, Ms. Arnott alleges that Defendants breached her employment agreement by failing to provide her with 90 days of pay and benefits after her termination. (*Id.* ¶¶ 27–30.) Count 5 alleges that Defendants breached the agreement by incorrectly calculating her bonus over the course of her employment. (*Id.* ¶¶ 31–34.) Finally, Ms. Arnott alleges in Count 6 that Defendants failed to provide her with the requisite forms to elect health insurance coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. § 1161, *et seq.* ("COBRA"). (*Id.* ¶¶ 35–39.)

### STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by

demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## ANALYSIS

### I.     Holzer and the Clinic are Joint Employers

Holzer argues that the Clinic—not Holzer—was Ms. Arnott's employer and thus Holzer cannot be held liable for Ms. Arnott's claims under the ADA, the FMLA, and Ohio Revised Code Chapter 4112. (Mot., PageID 171.) Ms. Arnott counters that Holzer acted as her joint employer. (Opp., PageID 757.)

"[C]ourts have fashioned various doctrines by which a defendant that does not directly employ a plaintiff may still be considered an 'employer.'" *Swallows v. Barnes & Noble Book Stores*, 128 F.3d 990, 993 (6th Cir. 1997). "The first approach analyzes whether two entities are

10

so interrelated that they may be considered a 'single employer' or an 'integrated enterprise.'" *Williams v. City of Columbus*, 892 F. Supp. 2d 918, 928 (S.D. Ohio 2012) (Marbley, J.) (citing *York v. Tennessee Crushed Stone Ass'n*, 684 F.2d 360, 362 (6th Cir. 1982)). The next approach analyzes whether "one defendant has control over another company's employees sufficient to show that the two companies are acting as a 'joint employer' of those employees." *Swallows*, 128 F.3d at 993 (citations omitted). The third approach examines whether the entity that allegedly engaged in an illegal or discriminatory practice acted as an agent of another company. *Williams*, 892 F. Supp. 2d at 928. Ms. Arnott argues the second approach applies.

To be liable under federal and state anti-discrimination laws as a joint employer, Holzer must "maintain[] sufficient control over some or all of the formal employees" of the Clinic "as to qualify as those employees' employer." *Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011). "Shar[ing] or co-determin[ing] those matters governing essential terms and conditions of employment" is evidence that one business is acting as the joint employer of another. *Id.* at 492 (citing *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir. 1985)). Other factors that may indicate Holzer acted as a joint employer include "the ability to hire, fire, and discipline, affect compensation and benefits, and direct and supervise performance." *Williams*, 892 F. Supp. 2d at 929.

The Court finds that Ms. Arnott has put forth sufficient evidence that Holzer acted as her joint employer. Because the Clinic did not have its own human resources department, it relied on Holzer's. (Purkey Dep., 6:14–24.) Bethany Purkey, the Vice President of Human Resources for Holzer, attended meetings and participated in emails between Dr. Broy, Mr. Chadwell, and Ms. Arnott, and took part in the process of issuing Ms. Arnott's COBRA notice. (*Id.* 21:02–10; 40:03–10; *see also* ECF No. 26-25, PageID 636 (emails between Ms. Arnott and her supervisors).)

Ms. Arnott received her notice of termination from Ellen Garling, Executive Vice President and Chief Legal Officer for Holzer (90-Day Notice, ECF No. 26-34), as well as from Dr. Broy from the Clinic (*Id.* PageID 715). Mr. Chadwell testified that Ms. Garling and Ms. Purkey both participated in the decision to terminate Ms. Arnott. (Chadwell Dep., 53:03–24.) The separation agreement offered to Ms. Arnott was between "Holzer Health System (Holzer)" and Ms. Arnott and stated that "Holzer employed Ms. Arnott in the position of Nurse Practitioner." (ECF No. 26-34, PageID 709.) Although Ms. Arnott was supervised by Clinic employees and signed an employment agreement with only the Clinic (*see* ECF No. 26-14), a reasonable juror could nonetheless find from this evidence that Holzer acted as Ms. Arnott's joint employer. Accordingly, Holzer cannot avoid liability on these grounds.

## II.    ADA Claims

As a preliminary matter and as this Court has noted, "Ohio disability discrimination law generally applies the same analysis as the ADA." *Schwendeman v. Marietta City Sch.*, 436 F. Supp. 3d 1045, 1059 (S.D. Ohio 2020), *aff'd*, No. 20-3251, 2020 U.S. App. LEXIS 39230 (6th Cir. Dec. 14, 2020) (citing *Johnson v. JPMorgan Chase & Co*., 922 F. Supp. 2d 658, 674 n.6 (S.D. Ohio 2013)). Ohio courts "look to regulations and cases interpreting the [ADA] for guidance in [their] interpretation of Ohio law." *Id.* Thus, the analysis and determination of Ms. Arnott's ADA claims will also apply to her state-law claims.

Under the ADA, an employer is prohibited from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). An employer's failure to grant a reasonable accommodation to a disabled employee is considered discrimination under the ADA.

*Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020); 42 U.S.C. § 12112(b)(5)(A). Taking adverse employment actions against an employee because of the employee's disability is also prohibited by ADA. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317–21 (6th Cir. 2012) (en banc). The ADA similarly forbids an employer from retaliating against an employee who has opposed an unlawful employment practice. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).

### A.    Failure to Accommodate Claim

An employer discriminates under the ADA by failing to make "reasonable accommodations to the known physical or mental limitations" of an otherwise qualified employee, unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). "Claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence." *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir. 2007)). Since failure to accommodate claims are not premised on indirect evidence, the familiar *McDonnell Douglas* burden shifting framework does not apply. *See* 411 U.S. 792 (1973). Instead, Ms. Arnott must first make a prima facie showing that Defendants failed to accommodate her disability and then the burden shifts to Defendants to show that the accommodation requested would impose an undue hardship. *Suboh v. Abacus Corp.*, No. 2:20-cv-6295, 2022 U.S. Dist. LEXIS 190587, at *11 (S.D. Ohio Oct. 18, 2022) (Morrison, J.) (citing *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974 (6th Cir. 2011)).

To establish a prima facie case for failure to accommodate, "an employee must show that (1) she is disabled within the meaning of the ADA, (2) she is otherwise qualified for the position, such that she can perform the essential functions of the job with or without a reasonable

accommodation, (3) the employer knew or had reason to know of her disability, (4) the employee requested an accommodation, and (5) the employer failed to provide a reasonable accommodation thereafter." *Kindred v. Light*, No. 22-5360, 2023 U.S. App. LEXIS 4798, at *17–18 (6th Cir. Feb. 27, 2023) (citing *Kleiber*, 485 F.3d at 869).

Defendants argue that Ms. Arnott was not qualified for her position because she could not perform the essential functions of a nurse practitioner with or without a reasonable accommodation. (Mot., PageID 173.) A "qualified individual with a disability" is defined under the ADA as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Analyzing whether an employee is qualified for a particular position raises two questions. *See King v. Steward Trumbull Mem. Hosp., Inc.*, 30 F.4th 551, 560 (6th Cir. 2022). First, could Ms. Arnott perform the essential functions of her job as a nurse practitioner with or without an accommodation. *See id.* Second, if she required an accommodation, was her required accommodation reasonable. *See id.* The Court addresses each question in turn.

### i. Ms. Arnott's requested accommodation eliminated an essential function of her position.

Ms. Arnott argues that her requested accommodation of six months of medical leave did not permanently eliminate an essential function because she could fulfill her job requirements when she returned from medical leave. (Opp., PageID 765; citing *Blanchet*, 27 F.4th at 1229.)

When determining whether a job function is essential, consideration is given to the employer's judgment and any written descriptions of the job. 42 U.S.C. § 12111(8). Essential functions are "the core job duties, not the marginal ones." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854 (6th Cir. 2018) (citing 29 C.F.R. § 1630.2(n)(1)). Other factors to consider include the time spent performing the function, the consequences of not requiring the employee to perform

the function, the work experience of past incumbents of the positions, and current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3). Often "[i]n failure-to-accommodate claims where the employee requests an accommodation that exempts her from an essential function, the essential function and reasonable accommodation analyses run together. One conclusion (the function is essential) leads to the other (the accommodation is not reasonable)." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 763 (6th Cir. 2015) (en banc) (quotations omitted).

Generally, attendance is an essential job function. *Ford Motor*, 782 F.3d at 761 (explaining that "an employee who does not come to work cannot perform any of his job functions, essential or otherwise.") In *Ford Motor*, the employee requested to telecommute up to four days each week but the Sixth Circuit concluded that because the employee's role as a steel buyer was highly interactive, attendance was an essential function of the job. *Id.* at 766. The holding of *Ford Motor*, however, does not automatically "apply where medical leave would enable the employee to return to work and perform the essential job duties." *King*, 30 F.4th at 561–62; *Hostettler*, 895 F.3d at 857 (concluding that "full-time presence at work is not an essential function of a job simply because an employer says that it is").

As a nurse practitioner Ms. Arnott's essential job duties included seeing new and existing patients to provide follow-up, acute, and preventive care. (Arnott Dep., 40:2–15; 43:3–19.) Outside of patient visits, she was also responsible for medication renewals, test results, and referrals. (Broy Dep., 20:3–8; 27:18–21; *see also* Chadwell Dep., 27:03–04; 30:06–09.) Ms. Arnott's ability to see patients—virtually or in-person—was an essential job function of a nurse practitioner and her requested medical leave of absence exempted her from that essential function.

The question becomes whether her requested accommodation permanently or temporarily eliminated an essential function of her role as a nurse practitioner. In other words, would her

requested accommodation of six months of medical leave allow her to fulfill her essential job functions upon her return. Here is where the "essential function" and "reasonable accommodation" analyses run together. *See Ford Motor*, 782 F.3d at 763. Without a clear prospect for recovery, [6] her leave request did not have a definite or certain end and would from Defendants' perspective permanently eliminate her essential job function of providing patient care.

The Clinic and Ms. Arnott's patients would face harsh consequences if she was not required to perform the essential function of a nurse practitioner. Ms. Arnott had her own unique patient base of over 700 patients whom she brought with her to the Clinic. (Arnott Dep., 36:16–21; 40:16–21.) Ms. Arnott testified that having her own patients allowed her to develop relationships with her patients and provide care over time. (*Id.* 23:3–8.) Ms. Arnott acknowledged that over the years her patients had been inconvenienced by her frequent absences. (*Id.* 132:17–23.) Like Ms. Arnott, the other nurse practitioners at the Clinic had their own patient populations and many were not accepting new patients. (Chadwell Dep., 44:4–6; 45:11–22; *see also* Broy Dep., 27:14–24; 28:1–10; 28:16–20; 37:6–19). Since Ms. Arnott had over 700 of her own patients, the Clinic could not reallocate Ms. Arnott's patients to other providers upon an extended leave of absence. (*Id.*) Thus, the consequence of not requiring Ms. Arnott to perform her essential job function was to deprive her patients of timely medical care.

Based on these facts, the Court finds that Ms. Arnott's ability to visit with patients and provide patient care was an essential function of her job. Because her requested accommodation was not for a certain temporary period, her requested accommodation removed an essential job function. The next question is whether her requested accommodation was reasonable.

---

[6] As discussed in more depth in the following section, Ms. Arnott has not shown that when she requested an accommodation that she had a clear prospect for recovery.

### ii. The reasonableness of Ms. Arnott's requested accommodation.

Defendants argue that Ms. Arnott's requested accommodation was unreasonable. (Mot., PageID 172–75.) Ms. Arnott views the situation differently and argues that Defendants refused to accommodate her disability despite her reasonable request. (Opp., PageID 759–65.)

"The Sixth Circuit has said that an employee 'bears the burden of proposing reasonable accommodations' and a failure to accommodate claim 'must be dismissed if the employee fails to identify and request such reasonable accommodations.'" *Williams v. Mid-Am. Conversion Servs.*, LLC, No. 2:22-cv-2052, 2023 U.S. Dist. LEXIS 219957, at *20 (S.D. Ohio Dec. 11, 2023) (quoting *Johnson*, 443 F. App'x at 983).

Medical leave can be a reasonable accommodation under the ADA when "it enables the employee to perform the essential function of attendance." *King*, 30 F.4th at 561. To determine the reasonableness of a request for medical leave, courts consider "(1) the amount of leave sought; (2) whether the requested leave generally complies with the employer's leave policies; and (3) the nature of the employee's prognosis, treatment and likelihood of recovery." *Id.* at 562. But a request for additional medical leave "is an objectively unreasonable accommodation where an employee has already received significant amounts of leave and has demonstrated 'no clear prospect for recovery.'" *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017) (quoting *Walsh v. United Parcel Serv.*, 201 F.3d 718, 727 (6th Cir. 2000)).

The first and third factors support a finding that Ms. Arnott's request for six months of additional medical leave after exhausting her FMLA leave was unreasonable. Because Defendants do not argue that Ms. Arnott's leave violated their policies, Defendants waive this argument and this factor supports a finding of reasonableness. *See, e.g.*, *Ky. Indus. Hemp, LLC v. Teterboro*

17

*Partners, LLC*, No. 23-5898, 2024 U.S. App. LEXIS 13846, at *10 (6th Cir. June 5, 2024) ("A party waives an argument by intentionally abandoning it.").

From the Court's perspective, the amount of leave Ms. Arnott sought is not on its own an inherently unreasonable accommodation, but it becomes unreasonable considering Ms. Arnott's prospect for recovery. *See Kindred*, 2023 U.S. App. LEXIS 4798, at *20 (explaining that the plaintiff had not shown a clear prospect for recovery such that plaintiff's request for four months of additional leave would be for a definite or certain duration); *see also Caldwell v. MGM Grand Detroit, LLC*, No. 23-1436, 2024 U.S. App. LEXIS 434, at *7 (6th Cir. Jan. 5, 2024) (concluding that a request for five months of additional medical leave was unreasonable after six months of leave and exhaustion of annual FMLA leave and employer-specific medical leave).

Ms. Arnott argues that her case is distinguishable from the cases cited above because she had not taken significant amounts of leave. When she requested an accommodation, she had only taken one month of continuous FMLA leave. (Opp., PageID 761.) Before then she had never taken continuous FMLA leave or exhausted her leave under the FMLA. (*Id.*) Ms. Arnott contends that her use of intermittent FMLA leave since 2016 should not be counted in the amount of leave she used before requesting additional medical leave. (*Id.* PageID 761–63.) She cites *Blanchet*, which found seven months of total leave to be a reasonable accommodation. 27 F.4th at 1229–31.

The Court agrees that Ms. Arnott's one month of continuous medical leave was not equivalent to the "significant" amounts of leave typically present where courts have found that added leave was unreasonable. *See Williams*, 847 F.3d at 394 (requesting additional leave after taking six months of leave); *Aston v. Tapco Int'l Corp.*, 631 F. App'x 292 (6th Cir. 2015) (refusing an employee's request for six weeks of additional leave after seven months of medical leave); *Kindred*, 2023 U.S. App. LEXIS 4798, at *22 (finding unreasonable plaintiff's request for four

more months of leave after taking over seven months of medical leave). But the fact that Ms. Arnott utilized intermittent FMLA from 2016 until 2021 influences the reasonableness of Ms. Arnott's proposed accommodation. While Ms. Arnott had not taken significant amounts of *continuous* FMLA leave, she had received significant amounts of *intermittent* leave from at the time that she requested six months of additional medical leave.

The circumstances of Ms. Arnott's requested accommodation are also distinguishable from *Blanchet*. There, the plaintiff after exhausting her parental leave, requested another 60 days of medical leave to adjust to new medications for her post-partum depression. 27 F.4th at 1228. Unlike Ms. Arnott, Ms. Blanchet's condition was acute and she requested a shorter period of additional leave. *Id.* at 1229–31. She also demonstrated a clear prospect for recovery by explaining that the extra 60 days would remedy her condition by affording her time to adjust to new medication. *Id.* These factors led the Sixth Circuit to conclude that her employer had no reason to believe that she would not return to work and was otherwise qualified for her position after her medical leave accommodation. *Id.* at 1229.

Ms. Arnott's reliance upon her treating physician's estimate that she might return to work before September 2022 is also unpersuasive. (*See* Opp., PageID 760–61.) The estimate was simply a speculation, not based upon medical certainty or even a likelihood. A physician's vague estimate of a return-to-work date alone does not demonstrate a clear prospect for recovery. *Williams*, 847 F.3d at 395 (finding the physician's return to work date was "only an estimate" and that because plaintiff had a history of taking leave and her condition failed to improve during those leaves, granting further leave as an accommodation would be unreasonable); *Maat v. County of Ottawa*, 657 F. App'x 404, 412–13 (6th Cir. 2016) (holding that added leave was not a reasonable accommodation because her physician's vague estimate of a return date was uncertain and

indicated that she might need further treatment); *Caldwell*, 2024 U.S. App. LEXIS 434, at *7 (explaining that plaintiff failed to show a clear prospect for recovery because she did not demonstrate how more leave would remedy her condition).

Dr. Lionberger's estimate for when Ms. Arnott could return to work was uncertain, indicated that she needed further treatment, and did not demonstrate a clear prospect for recovery. Although Dr. Lionberger suggested that Ms. Arnott might be able to return to work sooner than expected, her return depended on discovering the cause of Ms. Arnott's migraines and developing an effective treatment plan. (ECF No. 26-29, PageID 658.) Ms. Arnott had struggled with migraines most of her life. (Arnott Dep., 68:01–08.) Despite receiving treatment for her chronic migraines for decades, Ms. Arnott had only identified a few of her migraine triggers but not the cause of her migraines. (*Id.* 74:17–20; 75:10–14; 179:03–04.) Beyond stating Ms. Arnott had been referred to a specialist, nothing in the documentation explained how the added six months of leave would remedy her condition. (ECF No. 26-32, PageID 695–96.) Even Dr. Lionberger's estimate that Ms. Arnott would return by September 2022 seemed speculative and uncertain. (*Id.* at PageID 695–96, stating that Ms. Arnott may "possibly" return in September).

Finally, to show that her "prognosis was not as gloomy as Defendants portray," (Opp., PageID 760), Ms. Arnott points to her own declaration stating that she was prescribed new medication (Ajovy) after seeing a specialist and by mid-May felt well enough to consider contacting Dr. Lionberger about returning to work earlier. (Arnott Decl., ECF No. 35-1, ¶ 3.) She offers no other evidence besides her own declaration to suggest that her condition had improved. And Defendants had no knowledge that her condition had allegedly improved. Ms. Arnott's own declaration is "not enough to create an issue of fact to survive summary judgment." *Wolfe v. Vill. of Brice*, 37 F. Supp. 2d 1021, 1026 (S.D. Ohio 1999) (Marbley, J.) (citing *Anderson v. Liberty*

20

*Lobby, Inc.*, 477 U.S. 242 (1986)); *see also Hoffner v. Bradshaw*, 622 F.3d 487, 500 (6th Cir. 2010) (finding that a "self-serving affidavit carries little weight, especially in light of the copious evidence in the record to contradict it").

When Ms. Arnott requested six months of additional medical leave, she had received a significant amount of FMLA leave from 2016 until 2021 and had not shown that she had a clear prospect for recovery. Without evidence of how the added medical leave would remedy her migraines, her estimated return-to-work date was uncertain and unreasonable. Accordingly, Ms. Arnott has not satisfied her burden of proposing a reasonable accommodation and her failure-to-accommodate claim fails. *See Williams*, 2023 U.S. Dist. LEXIS 219957, at *20 (citation omitted).

### B.    Failure to Engage in the Interactive Process Claim

Ms. Arnott also argues that Defendants did not engage with her in the required interactive process when she made her request for six months of additional medical leave. (Am. Compl., ¶¶ 18–20.) But the Court need only examine the interactive process "after the plaintiff has established a prima facie case that the employer has failed to accommodate her." *Cheatham v. Postmaster Gen. of the U.S.*, No. 20-4091, 2022 U.S. App. LEXIS 9870, at *12 (6th Cir. Apr. 11, 2022). The "failure to engage in the interactive process is only an independent violation . . . if the plaintiff establishes a prima facie showing that [s]he proposed a reasonable accommodation." *Rorrer*, 743 F.3d at 1041. Because her failure to engage in the interactive process claim turns on her failure to accommodate claim, it also fails.

Even assuming Ms. Arnott had established a prima facie case, there is still no evidence that Defendants failed to engage in the interactive process. Once an employee has requested an accommodation, her employer must engage in an "informal, interaction process" to identify a suitable accommodation. *Brumley v. UPS*, 909 F.3d 834, 839–840 (6th Cir. 2018) (citing *Kleiber*,

485 F.3d at 871 (quoting 29 C.F.R. § 1630.2(o)(3)); *see also Hostettler*, 895 F.3d at 857. Both the employer and employee have a duty to participate in good faith. *Brumley*, 909 F.3d at 840. A party fails to participate in good faith if they cause "unnecessary delays or obstruct[s] the process" or "fail[] to adequately communicate or provide information during the process." *Id.* But the employer's refusal to provide a requested accommodation immediately is not alone a failure to accommodate. *Id.*

Ms. Arnott argues that Defendants should have contacted her after she requested the accommodation in March, but before they terminated her in May. (Opp., PageID 766–67.) By terminating her without further discussion in May, Ms. Arnott contends that Defendants did not participate in the interactive process in good faith. (*Id.*) And if they had contacted her in May, she asserts that Defendants would have learned that she was contemplating returning to work because her condition had improved. (*Id.*; Arnott Decl., ¶ 3.)

Ms. Arnott's narrow view of the time period required for the interactive process is too restrictive. Defendants made several attempts accommodate Ms. Arnott's migraines and reduce the number of days that she missed work, but those accommodations were unsuccessful. First, Defendants accommodated Ms. Arnott's sensitivity to fragrances by posting signage in the Clinic and instructing the Clinic's registration staff to notify her staff of any strong scents. (Chadwell Dep., 68:4–17; 68:18–24.) Then in November 2021, Defendants met with Ms. Arnott to discuss other possible accommodations including either reducing her schedule or changing the days she worked virtually and in the office. (Arnott Dep., 150:18–23; Chadwell Dep., 36:3–8; *see also* ECF No. 26-26; PageID 638.) Ms. Arnott decided against reducing her schedule but agreed to modify it so that she had Mondays off and saw patients virtually on Fridays. (Arnott Dep., 150:18–23; *see also* ECF No. 26-26; PageID 638.) When Ms. Arnott requested six months of medical leave, after

exhausting her FMLA leave, her treating physician Dr. Lionberger told Defendants that were no workplace restrictions or accommodations that would allow her to continue working. (ECF No. 26-32, PageID 695.) Believing that there was no accommodation that would allow Ms. Arnott to perform the essential functions of her job, Defendants made the decision to terminate Ms. Arnott's employment. (Mot., PageID 168.)

Defendants were under no obligation to propose a counter accommodation to Ms. Arnott's request for an additional six months of medical leave. *See Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 421 (6th Cir. 2020) (citing *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010)). Defendants' refusal to provide Ms. Arnott with her preferred accommodation immediately upon her request is also not by itself a violation of the ADA. *Brumley*, 909 F.3d at 840. No evidence shows that Defendants caused unnecessary delays or obstructed the process as to suggest they did not participate in the interactive process in good faith. *Id.* Accordingly, Ms. Arnott's claim that Defendants failed to engage in the interactive process fails as a matter of law.

### C.     Wrongful Termination Claim

Ms. Arnott also alleges that Defendants discriminated against her because of her disability in violation of the ADA by wrongfully terminating her employment. (Am. Compl. ¶¶ 18–20.) The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A plaintiff can establish a claim of disability discrimination with either direct or indirect evidence of discrimination. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016) (citations omitted). Without direct evidence, courts apply the *McDonnell Douglas* burden-shifting framework. *See* 11 U.S. 792 (1973).

Ms. Arnott argues that Defendants' refusal to provide her with a reasonable accommodation is direct evidence of discrimination and thus Defendants cannot use a legitimate,

nondiscriminatory rationale as a shield against liability. (Opp., PageID 769.) But under either framework—direct or indirect—Ms. Arnott must demonstrate that she is "otherwise qualified for the position." *See Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020) (applying direct evidence framework); *Ferrari*, 826 F.3d at 891–92 (applying indirect evidence framework). This element of a disability discrimination claim is the same as the "otherwise qualified" element in a failure-to-accommodate claim. *Id.* Because the Court found that Ms. Arnott was not otherwise qualified for her position with or without a reasonable accommodation, her wrongful termination claim fails for the same reasons.

Accordingly, Defendants' motion for summary judgment is **GRANTED** as to Count 1.

### D.    ADA Retaliation Claim

Count 2 of Ms. Arnott's Complaint alleges that Defendants illegally retaliated against her after she requested an accommodation. (Am. Compl., ¶¶ 21–23.) Defendants move for summary judgment arguing that Ms. Arnott cannot establish a causal connection between protected activity and an adverse employment action. (Mot., PageID 180.)

To prove an ADA retaliation claim, the Court applies the *McDonnell Douglas* framework. 411 U.S. 792 (1973). To establish a prima facie case, Ms. Arnott must show that she (1) engaged in protected activity under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against [her]; and (4) there was a causal connection between the protected activity and the adverse action." *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 304 (6th Cir. 2019) (quoting *Rorrer*, 743 F.3d at 1046).

The Sixth Circuit has held that requests for *reasonable* accommodations are protected activity under the ADA. *See A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013) ("Both this circuit and most others agree that requests for accommodation are protected

acts."); *see also Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997) (same). But since Ms. Arnott cannot establish that her request for six months of additional medical leave was a "reasonable" accommodation, she cannot establish a prima facie case for ADA retaliation. *See supra*, Section II(A)(ii). Further, as discussed below in her FMLA retaliation claim, even if she could establish a prima facie case, she cannot show Defendants' proffered reason for her termination was pretext.

Accordingly, Defendants' motion for summary judgment on Count 2 is **GRANTED**.

### III.    FMLA Retaliation

Defendants next move for summary judgment on Ms. Arnott's FMLA retaliation claim. (Mot., PageID 180–82; Am Compl., ¶¶ 24–26.) Ms. Arnott asserts that Defendants retaliated against her for taking continuous leave under the FMLA. (Opp., PageID 778–81.) The FMLA entitles employes to twelve weeks of leave per year for, among other things, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Under the FMLA an employer may not retaliate against an employee for taking twelve weeks of unpaid leave. *Id.* § 2615(a)(2). FMLA retaliation claims are subject to the *McDonnell Douglas* framework. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012).

### A.    Prima Facie Case

To establish a prima facie case of FMLA retaliation, Ms. Arnott must show that: (1) she engaged in an activity protected by the FMLA, (2) the exercise of her right was known to Defendants, (3) Defendants took an adverse employment action against her, and (4) there is a causal connection between the protected activity and the adverse action. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 616 (6th Cir. 2019).

Defendants do not contest that Ms. Arnott exhausted her FMLA leave, that Defendants knew about her exercising her right to such leave, or that Defendants took an adverse employment action against her by terminating her. (Mot., PageID 181.) Defendants argue that her claim should fail because she has not established causation. (*Id.*) Ms. Arnott supports the causation element by pointing to the temporal proximity between her FMLA leave and her termination, as well as her supervisors' hostile attitudes towards her leave requests. (Opp., PageID 779–81.)

Temporal proximity standing alone can only establish a prima facie case when the adverse employment action occurs in very close proximity to the protected activity. *See Stein v. Atlas Indus., Inc.*, 730 F. App'x 313, 319 (6th Cir. 2018) (quoting *Seeger*, 681 F.3d at 284) (comparing cases with eight-week and ten-week periods between protected activity and adverse employment action and finding ten-weeks is not "very close").

Ms. Arnott explains that before March 2022, she only utilized intermittent FMLA leave for her migraines. (ECF No. 26-30, PageID 674–75.) On March 28, 2022 she requested continuous leave, which she exhausted in April. (*Id.*) About a month after exhausting her FMLA leave, Defendants terminated her. (90-Day Notice, ECF No. 26-34, PageID 707.)

But courts in the Sixth Circuit have found that "evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of temporal proximity." *Sosby v. Miller Brewing Co.*, 415 F. Supp. 2d 809, 822 (S.D. Ohio 2005), *aff'd*, 211 F. App'x 382 (6th Cir. 2006) (citations omitted). Defendants were concerned about Ms. Arnott's migraines and corresponding attendance issues well before she exhausted her FMLA leave in April 2022. Ms. Arnott testified that her migraines worsened at the end of 2021 to the point that she was using most of her PTO to cover her absences. (Arnott Dep., 140:06–16.) Noticing her more frequent absences, Dr. Broy, Mr. Chadwell and Ms. Purkey met

26

with Ms. Arnott in November 2021 to discuss possible accommodations. (Chadwell Dep., 29:12–24; 30:1–9, 31:1–3; *see also* Purkey Dep., 21:02–07; Broy Dep., 19:01–15.) Since Ms. Arnott expressed that she was feeling dizzy and could not safely drive to work on days when she experienced migraines, Mr. Chadwell was troubled that Ms. Arnott may not be able to safely treat her patients—even virtually—on days when she had migraines. (Chadwell Dep., 62:09–19; explaining that if she could not operate a motor vehicle, she could not give sound medical advice.) Thus, Defendants' concerns about Ms. Arnott's ability to perform her job functions pre-dated her request for continuous FMLA leave and undercut the significance of the temporal proximity between exhausting her FMLA leave and her termination.

Along with temporal proximity, Ms. Arnott alleges that Dr. Broy and Mr. Chadwell responded negatively when she had requested time off for her migraines. She asserts that they told her she "needed to get her migraines under control" and suggested that she was using her migraines as an excuse to miss work. (Arnott Dep., 87:15–88:12; 88:22–89:08; 89:23–90:21.) Ms. Arnott also argues that Defendants' decision against back paying her bonus to make up for shortages in the previous years was further evidence of "hostility" towards her. (Opp., PageID 780.) Since taking intermittent leave resulted in comments and "subtle retaliation," Ms. Arnott speculates that a reasonable jury could find that her request for continuous instead of just intermittent leave was "the last straw." (*Id.* PageID 781.)

Even if this Court found these purported comments sufficient evidence to conclude Ms. Arnott established a prima facie case, Defendants have put forth a legitimate nondiscriminatory reason for Ms. Arnott's termination. Defendants explain that they terminated Ms. Arnott because she could not perform the essential functions of her position. (Opp., PageID 180–81.) Defendants' burden is one of production, not persuasion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

133, 142 (2000) (explaining that the burden does not entail a credibility assessment). Defendants proffered reason shifts the burden back to Ms. Arnott to prove that Defendants reason for her termination was pretext for unlawful retaliation. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 431 (6th Cir. 2014).

### B. Pretext

To avoid summary judgment on her FMLA retaliation claim, Ms. Arnott must show that a genuine issue of material fact exists as to whether Defendants' proffered reason for her termination was pretext for unlawful retaliation. "A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger*, 681 F.3d at 285 (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). "Whichever method the plaintiff employs, [s]he always bears the burden of producing sufficient evidence from which the jury could reasonably reject [Defendants'] explanation and infer that [Defendants] intentionally discriminated against [her]." *Id.* (citing *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011)).

Ms. Arnott does not specify which of the three methods she applies. (Opp., PageID 774; explaining that the methods "are not meant to operate as rigid categories.") Since Ms. Arnott attacks the credibility of Defendants' purported justification for her termination, presumably she is not arguing pretext under the third method. *Joostberns v. UPS*, 166 F. App'x 783, 791 (6th Cir. 2006) (clarifying that unlike the first two methods, the third method does not attack the credibility of the employer's proffered reason). And as she does not offer evidence that other employees were treated differently, she does not allege pretext under the second method. *See id.* (explaining that the second method is shown with evidence that other employees were not treated adversely for similar conduct). The Court, therefore, analyzes her pretext claim under the first method.

To show Defendants' proffered reason had no basis in fact, the employee attacks the credibility of the employer's proffered reason and must show that the employer did not actually have cause to take adverse action against the employee. *Seeger*, 681 F.3d at 285 (quoting *Joostberns v. UPS*, 166 F. App'x at 791). "Where the employer can demonstrate an honest belief in its proffered reason, however the inference of pretext is not warranted." *Id.* (citation omitted).

"Under the honest belief rule, an employer's reason is considered honestly held where the employer can establish it reasonably relied on particularized facts that were before it at the time the decision was made." *Id.* Then the burden shifts to the plaintiff to demonstrate the belief was not honestly held. *Id.* But the employee's "bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question' and fails to create a genuine issue of material fact." *Id.* (citation omitted).

The employer's decision-making process does not have to be "optimal" nor does it need to leave no stone unturned. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). "Rather, the key inquiry is whether the employer made a reasonable informed and considered decision before taking an adverse employment action." *Id.* Even if ultimately proven false or mistaken, if the employer believed its proffered reason, the employee cannot establish pretext. *Id.* at 806.

Ms. Arnott urges the Court to reject Defendants' justification that she could not perform the essential functions of her position as false. (Opp., PageID 774.) Defendants knew she was scheduled to see a specialist in May and should have followed up with her before firing her. (*Id.* PageID 777.) She argues that Defendants' decision to "hastily terminate[] [her] without seeing if her condition had improved" is evidence that Defendants' reason for her termination is pretextual. (*Id.* PageID 745; 773–75.) Defendants also justified Ms. Arnott's termination by saying they could not hold open her position and needed to hire a replacement to reallocate her patients. (ECF No.

26-34, PageID 707.) But Ms. Arnott argues that Defendants did not hire a replacement for her, and thus the purported justification was not supported. (Opp., PageID 776.)

Ms. Arnott's arguments are unpersuasive. Ms. Arnott had suffered from migraines for most of her life but her symptoms dramatically worsened in 2021 and 2022. When Defendants made the decision to terminate Ms. Arnott, they had made several efforts to accommodate her chronic migraines over the years, discussed *supra* at Sections II(A)–(B). When Ms. Arnott requested six months of medical leave, after exhausting her FMLA leave, her treating physician Dr. Lionberger suggested that were no workplace restrictions or accommodations that would allow her to continue working or return to work earlier. (ECF No. 26-32, PageID 695.) Dr. Lionberger also could not say that she was confident Ms. Arnott would return to work after her six-month leave of absence. (*Id.* PageID 696; explaining that Ms. Arnott "possibly will return" on September 8, 2022.) Believing that no accommodation allowed Ms. Arnott to perform the essential functions of her job, Defendants terminated her. (Mot., PageID 168.)

While it may have been "optimal"—at least for Ms. Arnott—for Defendants to follow up with her regarding her specialist appointment in May, Defendants' decision-making process does not have to be optimal. *Smith*, 155 F.3d at 807. Nor are Defendants required to leave no stone unturned before taking adverse employment action. *Id.* Defendants' decision to terminate Ms. Arnott was reasonable and informed considering the prior accommodations and her lack of clear prospect for recovery. Thus, Ms. Arnott has not put forth sufficient evidence that Defendants' reason for her termination had no basis in fact or was pretext for unlawful FMLA retaliation.

Accordingly, Defendants' motion for summary judgment on Count 3 is **GRANTED.**

IV.    **Breach of Employment Agreement**

30

Ms. Arnott alleges that Defendants breached her employment agreement in two ways. First, by failing to provide her with 90-days of pay and benefits after notice of her termination. (Am. Compl., ¶¶ 27–30.) Second, by incorrectly calculating her bonus payments. (*Id.* ¶¶ 31–34.)

## A. Breach of Contract Claim Against Holzer

Defendants argue that because only the Clinic signed Ms. Arnott's employment agreement, Holzer cannot be held liable on her breach of contract claims. (Mot., PageID 183.) Ms. Arnott does not dispute that the only she and the Clinic signed the agreement but contends that Holzer should be considered a party to the agreement as a joint employer. (Opp., PageID 782.)

Joint employer liability allows the Court to treat an entity that is "not the plaintiff's employer as if it were the employer for purposes of employment laws." *Sanford*, 449 F. App'x at 491. But the joint employer doctrine applies only to employment liability, not breach of contract claims. *Parks v. Lyash*, No. 22-5841, 2023 U.S. App. LEXIS 8777, at *19 (6th Cir. Apr. 12, 2023) (concluding that the party not in privity with the employee could not be held liable for breach of contract). Ms. Arnott cites no case law to support her position that joint employer liability extends to breach of contract claims. (Opp., PageID 782.) Because there is no evidence that Holzer entered an express or implied contract with Ms. Arnott, or that it was an intended beneficiary of Ms. Arnott's employment agreement, Holzer is entitled to summary judgment on Ms. Arnott's breach of contract claims. *Parks*, 2023 U.S. App. LEXIS 8777, at *19 ("Summary judgment cannot be defeated by conclusory allegations, unsupported by specific evidence.").

## B. Breach of Contract for 90 Days of Pay and Benefits

Count 4 of Ms. Arnott's Complaint alleges that the Clinic breached her employment agreement by failing to provide her with 90 days of pay and benefits upon notice of her termination. (Am. Compl., ¶¶ 27–30.) The Clinic moves for summary judgment arguing that Ms. Arnott, by the

plain terms of her employment agreement, unambiguously waived her right to 90 days of pay and benefits because she could not perform her contractual duties. (Mot., PageID 184.)

Ms. Arnott's employment agreement dictates that Ohio law applies to "all questions concerning the validity, intention or meaning of this Agreement." (Employment Agreement, PageID 551.) "Breach of contract, under Ohio law, 'requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach.'" *Mares v. Miami Valley Hosp.*, 671 F. Supp. 3d 812, 832 (S.D. Ohio 2023) (Newman, J.) (citing *Lucarell v. Nationwide Mut. Ins.*, 97 N.E.3d 458, 469 (Ohio 2018)). "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *Id.* (quoting *Nationwide Mut. Fire Ins. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995)). A contract is ambiguous if the terms of the contract "cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations." *SHH Holdings, LLC v. Allied World Specialty Ins.*, 65 F.4th 830, 837 (6th Cir. 2023) (citations omitted).

To support its argument, the Clinic cites the section of the employment agreement that stated "[a]ny compensation to [Ms. Arnott] under the terms of this Agreement shall be waived upon any disability which prevents [her] from carrying out []her full scope of contractual duties in accordance with the Short and Long Term Disability Insurance Policy then in effect as may be amended from time to time in the Clinic's sole discretion." (Employment Agreement, ECF No. 26-14, PageID 548.) Thus, the Clinic argues it did not breach her employment agreement when it did not compensate her for 90 days following her notice of termination. (Mot., PageID 183–84.)

The terms of Ms. Arnott's employment agreement were clear. If Ms. Arnott was disabled and could not perform her contractual duties because of a disability, she waived her right to

compensation. (*See* Employment Agreement, PageID 548.) Two months before Ms. Arnott was terminated, she informed the Clinic that she needed six months of medical leave and would be filing for disability benefits. (Arnott Dep., 170:10–171:03.) Ms. Arnott was terminated on May 23, 2022. (90-Day Notice, PageID 707.) On June 3, 2022, Sun Life determined that she was entitled to short term disability benefits dating back from March 9, 2022 through June 7, 2022. (ECF No. 26-31, PageID 690.) She received long term disability benefits from June 8, 2022 through the end of her 90-day notice period in August 2022. (ECF No. 26-33, PageID 702.)

Ms. Arnott's argument that at the time that the Clinic terminated her employment, she had not received short- or long-term disability benefits and thus could not waive her right to 90 days of pay and benefits is unavailing. (Opp., PageID 782–83.) Ms. Arnott's migraines prevented her from carrying out the full scope of her contractual duties and she waived the 90 days of benefits under her agreement. Because she waived her right, the Clinic did not breach the employment agreement when it did not compensate her accordingly. Ms. Arnott's breach of contract claim is further undermined by the fact that the Clinic offered Mr. Arnott a severance package with 90 days of pay and benefits, but Ms. Arnott rejected that offer. (*See* 90-Day Notice, PageID 707, 710.)

Given that no breach of the employment agreement occurred, the Court will not entertain Ms. Arnott's "free-standing" good faith claim. *See Patrick v. CitiMortgage, Inc.*, 676 F. App'x 573, 577 (6th Cir. 2017) (collecting cases).

Accordingly, Defendants' motion for summary judgment on Count 4 is **GRANTED.**

### C.    Breach of Contract for Bonus Payments

The Clinic also moves for summary judgment on Count 5 of Ms. Arnott's Complaint. (Mot., PageID 184–86.) Ms. Arnott argues that Defendants breached her employment agreement

by incorrectly calculating her bonus from 2013 until 2022. (Am. Compl., ¶¶ 31–34.) She asserts that she is entitled to around $30,000 in unpaid bonuses. (*Id.* ¶ 34.)

When Ms. Arnott was hired in 2012, she received a base salary, plus the potential for a productivity bonus at 3.5% of services billed over $180,000. (ECF No. 26-3, PageID 452.) In 2013, the Clinic's bonus structure changed to lower the bonus percentage and dollar threshold to 3% of billed services over $100,000. (Mot., PageID 185.) A note in Ms. Arnott's personnel file states that her production incentive bonus dropped to 3% over $100,000 in January 2013. (ECF No. 26-6, PageID 494; *see also* Neal Dep., ECF No. 26-5, 17:4–23.)

Ms. Arnott argues that her 2013 employment agreement conflicts with this understanding. The agreement that took effect in April 2013 said that she would be paid a "guaranteed annual salary" plus a bonus of "3% of [her] gross bookings." (ECF No. 26-8, PageID 499.) Noticeably absent from her agreement is $100,000 threshold (*see id.*), thus Ms. Arnott argues that her bonus should have been calculated from the first patient she saw each year. (Am. Compl., ¶ 33.) To support her argument, she points to an email from Ms. Neal instructing her colleagues to "stop the practice we've been applying to Lori Arnott. She should receive her full production bonus for this first quarter of 2022 and each one thereafter." (ECF No. 26-16, PageID 561.) Ms. Neal suggested to Dr. Broy that Ms. Arnott be paid $3,000 per year for the previous two years, but Dr. Broy did not "feel that any backpay is warranted/needed." (*Id.* at PageID 561–62.) Ms. Neal's email, according to Ms. Arnott, shows that the Clinic incorrectly calculated her bonus and breached her agreement. (Opp., PageID 786.) At minimum, she contends that there is a genuine issue of material fact as to whether the $100,000 threshold continued to apply to Ms. Arnott's incentive bonus. (*Id.*)

The Court agrees. A contract is ambiguous if the terms of the contract "cannot be determined from the four corners of the agreement or where contract language is susceptible to

two or more reasonable interpretations." *SHH Holdings*, 65 F.4th at 837 (citations omitted). Ms. Arnott's 2013 employment agreement is susceptible to two or more reasonable interpretations. First, the employment agreement could be interpreted the way Ms. Arnott interpreted it—as eliminating the $100,000 threshold. Because the employment agreement did not contain a dollar threshold, Ms. Arnott's interpretation is reasonable.

The Clinic's interpretation is also reasonable. The Clinic argues that the 2013 employment agreement incorporated the previous dollar threshold for her productivity bonus. (Mot., PageID 185.) To support this interpretation, the Clinic points to the language in the agreement that says that "[a]ll compensation shall be payable in accordance with the Clinic's normal policies for the payment of APPs." (ECF No. 26-8, PageID 499.) The agreements she signed in 2017 (ECF No. 26-12, PageID 526), 2019 (ECF No. 26-13, PageID 537) and 2021 (ECF No. 26-14, PageID 548) all contained the same language. The Clinic also cites another note in Ms. Arnott's personnel file from 2016 that states that her "arrangement" was a "3% incentive after the first $100,000 she produces." (ECF No. 26-15, PageID 559.) The Clinic asserts that this note is evidence that the agreements incorporated the $100,000 threshold for Ms. Arnott's bonus.

The Clinic also raises, in a footnote, a statute of limitations defense—arguing that any of Ms. Arnott's claims related to her bonus that fall outside the six-year statute of limitations should be time-barred. (Mot., PageID 185, n.14.) Ohio Revised Code § 2305.06 provides a six-year statute of limitations for breach of contract claims. *Hogan v. Guardian Life Ins. of Am.*, No. 1:23-cv-2146, 2024 U.S. Dist. LEXIS 202679, at *6 (N.D. Ohio Nov. 7, 2024). But that limitations period has varied over the years. In 2012, the fifteen-year statute of limitations for breaches of written contract claims was shortened to eight years, Ohio Rev. Code § 2305.06 (2012), and was shortened again in 2021 to six years, Ohio Rev. Code § 2305.06 (2021). *Id.* "In Ohio, the statute of limitations in

effect on the date the claim arose is, generally, the applicable statute of limitations." *Id.* (citations omitted). A breach of contract claim accrues "the moment when the breach is complete and the counterparty is injured." *Mukamal v. Columbus Life Ins.*, No. 1:23-cv-122, 2024 U.S. Dist. LEXIS 6783, at *6 (S.D. Ohio Jan. 12, 2024) (Cole, J.) (citing *Kincaid v. Erie Ins.*, 944 N.E.2d 207, 210 (Ohio 2010)).

The Clinic carries the burden to show that the statute of limitations has run. *Metron Nutraceuticals, LLC v. Cook*, No. 23-3596, 2024 U.S. App. LEXIS 21200, at *32 (6th Cir. Aug. 20, 2024). "Application of a statute of limitations presents a mixed question of law and fact; when a cause of action accrues is a question of fact, but in the absence of a factual issue, application of the limitations period is a question of law." *Id.* (quoting *Schmitz v. NCAA*, 155 Ohio St. 3d 389, 2018- Ohio 4391, 122 N.E.3d 80, 85 (Ohio 2018)). Here, an issue of fact exists as to when Ms. Arnott's breach of contract claims accrues as to determine which limitations period applies. Not only is the contract susceptible to multiple reasonable interpretations, but the Clinic has not met its burden to show the statute of limitations has run.

Accordingly, the Motion for Summary Judgment on Count 5 is **GRANTED IN PART** as to Holzer and **DENIED IN PART** as to the Clinic.

## V.     COBRA Claim

In her final claim, Ms. Arnott asserts that Defendants and their agent Peoples Insurance Company violated the notice requirements of COBRA. (Am. Compl., ¶¶ 35–39.) COBRA amended the Employee Retirement Income Security Act ("ERISA") to require an "employer . . . to give the plan's qualified beneficiaries the opportunity to elect continuation coverage under the plan if the beneficiaries might otherwise lose coverage upon the occurrence of certain qualifying events." *Geissal v. Moore Med. Corp.*, 524 U.S. 74, 80 (1998) (citation omitted). If a covered

employee is terminated, COBRA requires the administrator of the employee's health plan to notify the employee of their rights to continued coverage within 44 days of termination. 29 U.S.C. § 1166; *see also Chenoweth v. Wal-Mart Stores, Inc.*, 159 F. Supp. 2d 1032, 1044, n.4 (S.D. Ohio 2001) (Kinneary, J.).

Defendants concede that Ms. Arnott did not receive timely notice of her right to elect COBRA continuation coverage. (Mot., PageID 186–88.) Without contesting liability, Defendants argue that Ms. Arnott is not entitled to damages because she fails to put forth sufficient evidence that Defendants acted in bad faith. (*Id.*)

Courts may impose penalties of up to $110 per day for failing to provide COBRA notice, but the exact amount is left to the Court's discretion. *Chapman v. Brentlinger Enters.*, No. 23-3582/3613, 2024 U.S. App. LEXIS 31694, at *50 (6th Cir. Dec. 13, 2024); *see also* 29 U.S.C. § 1332(c)(1) (explaining that the court may, in its discretion, impose a penalty "up to" the statutory limit); 29 C.F.R. § 2575.502c-1 (increasing the statutory penalty to $110 per day). The two most consequential factors are whether the employer acted in bad faith and whether the plaintiff was prejudiced. *Chapman*, 2024 U.S. App. LEXIS 3164, at *50 (citation omitted) (clarifying that neither is a prerequisite to recovery); *see also Nero v. Univ. Hosps. Mgmt. Servs. Org.*, No. 1:04CV1833, 2006 U.S. Dist. LEXIS 76546, at *16 (N.D. Ohio Oct. 12, 2006) (quoting *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1068 (6th Cir. 1994) for the proposition that some courts will not impose penalties unless the evidence shows that defendants acted in bad faith).

The evidence that Ms. Arnott was prejudiced by the late COBRA notice is minimal. While she did not receive timely COBRA notice because Peoples sent her notice to an incorrect address, she did receive a letter from Holzer explaining that Peoples would be sending her a COBRA notification form. (Purkey Decl., PageID 583; Arnott Dep., 100:17–101:13.) But Ms. Arnott was

not without coverage because she obtained Medicaid insurance through the marketplace. (ECF No. 26-36; *see also* Arnott Dep., 104:03–11; 108:08–17.) If she had received timely COBRA notice, Ms. Arnott alleges that she may have elected COBRA coverage. (Arnott Dep., 103:12–17; 104:12–21.) Even though her Medicaid coverage had no premiums to pay, Ms. Arnott asserts that she incurred out-of-pocket expenses for her medication. (Opp., PageID 788; Arnott Dep., 104:22–24; 105:03–05.) The record, however, does not indicate whether Ms. Arnott would have had to pay out-of-pocket expenses for her medication had she elected coverage under COBRA. Nor does she argue that she delayed any medical care because of her insurance coverage. *See Fadalla v. Life Auto. Prods. Inc.*, No. 206CV02679BBDTMP, 2009 U.S. Dist. LEXIS 95395, at *13 (W.D. Tenn. Oct. 13, 2009) (finding prejudice when the plaintiff "postpone[d] needed medical care treatment"). Thus, the Court cannot say with certainty that Ms. Arnott was not in as good of a financial position as she would have been in had she elected coverage. Therefore Ms. Arnott did not raise a genuine issue of material fact that she suffered prejudice from the late COBRA notice.

To support her argument that Defendants acted in bad faith, Ms. Arnott argues that Defendants knew she had not received COBRA notice by October 2022, and still waited to send her notice until April 2023. Ms. Arnott's counsel emailed Holzer in October 2022 requesting documentation of the COBRA notice. (ECF No. 35-2.) Ms. Arnott argues that at that time, Defendants learned that she had not received COBRA notice and should have corrected the clerical error on the original letter. (Opp., PageID 788.) If not then, then Defendants should have corrected the error after she filed her Complaint, but Defendants waited four more months to send her notice after her Complaint was filed. (*See* Compl., ECF No. 1; ECF No. 26-36.)

A clerical error normally does not show Defendants acted in bad faith, but Defendant's failure to correct its clerical error could. *See Buford v. Gen. Motors, LLC*, No. 4:16-CV-14465-

TGB-MKM, 2022 U.S. Dist. LEXIS 14660, at *42 (E.D. Mich. Jan. 26, 2022) ("failure to acknowledge and correct a clerical error that could have easily been resolve" may be evidence of bad faith). Ms. Arnott has put forth enough evidence to create a genuine issue of material fact as to whether Defendants' delay in sending COBRA notice was in bad faith.

A genuine dispute of fact also exists over the measure of damages incurred by Ms. Arnott. *See Chapman.*, 2024 U.S. App. LEXIS 3164, at *51–52 (affirming district court's award of $85 in damages per day after balancing the significant prejudice to the plaintiff against the lack of evidence of bad faith); *Cultrona v. Nationwide Life Ins.*, 936 F. Supp. 2d 832, 855 (N.D. Ohio 2013), *aff'd*, 748 F.3d 698 (6th Cir. 2014) (assessing damages of $55 per day where there was neither prejudice nor bad faith).

Accordingly, the motion for summary judgment as to Count 6 is **DENIED**.

## CONCLUSION

For the reasons above, Defendants' Motion (ECF No. 26) is **GRANTED IN PART** and **DENIED IN PART**. Defendants are entitled to summary judgment on Counts 1 through 4 of the Complaint, and Defendant Holzer is entitled to summary judgment on the breach of contract claim under Count 5. Genuine issues of material fact exist regarding Ms. Arnott's breach of contract claim against the Clinic under Count 5, and the amount of damages Ms. Arnott is entitled to on her COBRA claim under Count 6.

This matter is set for the jury trial to commence on April 28, 2025. (ECF No. 41.) This case remains open.

**IT IS SO ORDERED.**

**12/20/2024_____**          **s/Edmund A. Sargus, Jr._____**
**DATE**                                   **EDMUND A. SARGUS, JR.**
                                           **UNITED STATES DISTRICT JUDGE**